[Cite as *State v. Wilson*, 2026-Ohio-216.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee/Cross-appellant

v.

Joe J. Wilson

    Appellant/Cross-appellee

Court of Appeals No.   {48}L-23-1154
{48}L-23-1155

Trial Court No.  CR0201803239
CR0202202182

**DECISION AND JUDGMENT**

Decided: January 23, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee/cross-appellant.

Henry Schaefer, for appellant/cross-appellee.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} In this consolidated appeal, appellant, Joe Wilson, appeals from the September 5, 2023 judgment of the Lucas County Court of Common Pleas convicting him of rape, burglary, and gross sexual imposition. The State filed a cross-appeal arguing that the trial court erred when it failed to impose an indefinite prison term on

appellant's burglary conviction. For the following reasons, we affirm, in part, and reverse, in part, the trial court's judgment.

## A. Facts and Procedural Background[1]

{¶ 2} On July 18, 2022, appellant was indicted on one count of aggravated burglary in violation of R.C. 2911.11(A)(1) and (B), a first-degree felony; one count of rape in violation of R.C. 2907.02(A)(1)(c) and (B), a first-degree felony; one count of burglary in violation of R.C. 2911.12(A)(2) and (D), a second-degree felony; and one count of gross sexual imposition in violation of R.C. 2907.05(A)(5) and (C), a fourth-degree felony.[2] The charges arose from two separate incidents that occurred on July 6, 2022.

{¶ 3} In the first incident, the victim, S.B., called 911 at 4:37 A.M. She informed the operator that someone had broken into her house on Bronson Avenue in Toledo, Ohio, and began performing oral sex on her while she was sleeping. She reported that when she awoke, she determined that it was appellant and pushed him out the back door and called 911. In the second incident, the victim, A.D., called 911 from a residence on White Street in Toledo, Ohio, at 5:10 A.M. She reported that she awoke to find appellant

---

[1] Due to the nature of appellant's assigned errors, our background summary is longer and more detailed than most of our decisions as it includes all pretrial history and lengthy trial testimony.

[2] At trial, the State alleged that appellant's conduct in the underlying case violated the terms of the community control he was serving from a previous case. Despite filing a notice of appeal from the judgment imposing sentence on his community control violation, appellant did not assign error to that judgment in his brief.

2.

touching her genitals. She stopped appellant who then went upstairs to use the restroom and then left the residence.

{¶ 4} Appellant was arrested on July 20, 2022. He appeared for his arraignment on July 25, 2022. He was determined to be indigent and was appointed counsel. He then entered a not guilty plea to all four counts in the indictment. The trial court set appellant's bond at $400,000. Appellant was unable to secure the bond amount and remained in custody for the duration of the proceedings below.

{¶ 5} The parties appeared for several pretrial hearings prior to the commencement of trial on May 2, 2023. At the hearing on September 6, 2022, appellant's counsel informed the trial court that it had received all discovery from the State but had not been able to schedule an appointment with the jail facility to review the evidence with appellant. The trial court set the matter for another pretrial on October 12, 2022, to permit trial counsel to review the evidence with appellant. At that pretrial, counsel indicated that it had reviewed "the majority" of the evidence with appellant and requested the matter be set for trial at a date sufficient to allow for review of the remaining evidence. The court set the matter for trial on January 10, 2023, with another pretrial scheduled for November 18, 2022. At that pretrial, the trial court confirmed the trial date after appellant informed the court that the matter was likely to proceed to trial.

{¶ 6} On January 6, 2023, the parties appeared for a final pretrial. At that time, appellant sought a continuance of the trial based on the State'sfailure to provide a requested bill of particulars, to locate and compel an additional witness to appear, and for appellant's counsel to investigate potential alibi witnesses appellant had recently

3.

identified. The trial court granted appellant's motion based on the lack of a bill of particulars. However, it cautioned appellant's counsel that Crim.R. 12.1 required him to file a notice of alibi if appellant intended to present an alibi defense at trial as one had not yet been filed.

{¶ 7} At the conclusion of the pretrial, appellant then spoke to the court, complaining that his counsel "[kept] continuing my trial," indicating a desire to proceed to trial on the originally scheduled date. The trial court informed appellant that it could proceed with the original trial date but that he would be waiving his ability to present an alibi defense, subpoena witnesses, or to review the anticipated bill of particulars with counsel. Appellant then consented to the continuance of his trial until May 2, 2023.

{¶ 8} The parties next appeared for a pretrial on April 14, 2023. At that time, the trial court noted that appellant had filed two pro se motions—a motion seeking a bill of particulars and a motion to sever the offenses for trial. The trial court informed appellant that it could not accept these motions as only his counsel could file motions and that it had already granted the properly filed request for a bill of particulars. Appellant told the court that he had requested trial counsel file these motions but counsel had declined. Counsel again noted that it had previously filed the request for a bill of particulars but offered no comment on the pro se motion to sever. The trial court denied appellant's motions.

{¶ 9} At a final pretrial on April 28, 2023, trial counsel made an oral motion to dismiss, at appellant's insistence. Trial counsel informed the court that there was no legal defect in the indictment and that he was only making the motion at appellant's request,

4.

informing the court that he had previously explained to appellant that there was no basis for the motion. The trial court denied the motion. Appellant then asked "can I fire [counsel]?" Appellant claimed that trial counsel had not visited him in jail for three months and continued to refuse to file motions he requested. He also stated that when trial counsel had visited, that they did not review evidence the state provided. He did acknowledge trial counsel's statement that he had scheduled a visit with appellant the following day to prepare for trial. Trial counsel informed the court that he had already gone over the evidence with appellant at previous visits and that he did not have a basis to file the motions appellant requested. Appellant then stated that he would prefer to hire his own attorney. The trial court explained that appellant had not given a sufficient basis to replace his appointed counsel but that he was free to retain counsel for the upcoming trial. Notably, relevant to his argument that trial counsel was ineffective for failing to file a notice of alibi, appellant did not argue that trial counsel failed to investigate any potential alibi defense during the final pretrial.

{¶ 10} The matter proceeded to trial on May 2, 2023. Following jury selection, the State and appellant provided the jury with opening statements. In appellant's opening, he informed the jury that one of the primary questions it would have to answer was whether appellant was present in the residences at the time the offenses occurred. He did not, however, inform the jury that he would introduce any evidence or elicit any testimony to show that he had an alibi for the time the offenses were committed. At the

5.

conclusion of opening statements, the State began presenting its case-in-chief, during which it elicited the following testimony:[3]

**Testimony of Lt. Philip Cook**

{¶ 11} At the time of trial, Lieutenant Philip Cook had been a member of the Toledo Police Department for 27 years. In that time, he had served in "field operations, communications, inspections, community services" and was "currently assigned as [the department's] communication all hazards liaison homeland security coordinator." One of the duties of this position was to "provide 911 recordings upon request from the Lucas County Prosecutor's office." Cook testified that he had provided recordings of two calls to the State related to the charges pending against appellant.

{¶ 12} After providing this background information, the State presented Cook with two exhibits—designated 21 and 22, respectively. Cook confirmed that the exhibits consisted of the 911 calls the victims made on July 6, 2022 along with a corresponding Incident Detail Report prepared by the 911 operator and police dispatcher related to the contents of each call. Cook noted that the first call was placed at 4:37:58 a.m. with the second call being placed at 5:10:09 a.m. The recording of the 911 calls were then admitted into evidence, without objection from appellant, and played for the jury. On cross-examination, Cook confirmed that the calls were made approximately 33 minutes apart.

**Testimony of S.B.**

---

[3] Testimony and evidence unrelated to appellant's assigned errors has been omitted from this summary.

6.

{¶ 13} S.B. testified that she had lived at her current address on Bronson Avenue in Toledo, Ohio, for 4.5 years at the time of trial. She confirmed that appellant had never lived at the residence. S.B. had never been in a relationship with appellant but has a fraternal twin sister that was dating appellant at all relevant times. She explained that her sister had previously resided at the same residence but had moved out approximately three months before the underlying event.

{¶ 14} S.B. then turned to the events of July 6, 2022. She testified that she had been sleeping in the living room at her residence after hosting a gathering the previous evening. S.B. had four children who were all sleeping in the room with her. She and her 4-year-old child were sleeping on the couch. She was lying on her side, facing the back of the couch. When she went to sleep she was wearing a "tank top and some loose boxers" and underwear.

{¶ 15} She next recalled that she awoke to find someone "touching and licking" her vagina. She initially thought that she might be dreaming. She then reached behind her and felt someone's head. This "woke [her] up fully to where [she] was like 'what the heck is going on.'" She pushed the individual she identified as appellant away from her and toward the door. Appellant offered her $200 to allow him to continue. She declined and continued pushing him out the door. Once appellant exited, she locked the door and called 911. She informed the operator that Appellant had raped her.

{¶ 16} After speaking with the 911 operator, S.B. began looking through the house to determine how appellant got in as she had locked the doors the night before. She discovered that her furnace room door was open despite having closed it when she went

7.

to bed.  She then found a window partially ajar.  S.B. believed that this was how appellant gained entry to her residence because he did not have a key and she had locked the doors before going to sleep.

{¶ 17} The responding officers arrived approximately 10 minutes after the 911 call.  They developed a photo array that included appellant and several other individuals.  S.B. identified appellant in the photo array.  She then followed the officer's advice and proceeded to the hospital for a "rape kit" examination.  She testified that this included taking "swabs" and pictures of her vagina and the hospital collecting her clothing, which she believed was to identify any DNA on her clothing.

{¶ 18} On cross-examination, S.B. testified that she had known appellant approximately four years prior to this incident.  During that time, appellant had previously visited her residence as he was dating S.B.'s fraternal twin sister.  She denied having any contact with appellant after his relationship with her sister ended and denied having spent time alone with appellant the night before the incident.  She also denied having ever had a romantic relationship or any sexual encounter with appellant.  She also discussed her friendship with the other victim in this case, A.D.

{¶ 19} On redirect, S.B. briefly reiterated that when appellant began performing oral sex on her that she thought she may have been dreaming until she reached back and felt appellant's "stubbles and baldness."  She concluded her testimony describing the traumatizing effect of the incident and the fear she feels when she is home alone.

8.

**Testimony of A.D.**

{¶ 20} A.D. began her testimony by describing her familiarity with appellant prior to the underlying incident. She explained that she had been familiar with appellant as he was dating her friend (S.B.'s sister), but that she had never been in a romantic relationship with appellant. She had also never given appellant permission to touch her and did not give him permission to enter the residence on the night of the incident.

{¶ 21} A.D. next recalled the events of July 5, 2022. That evening she attended a birthday party for S.B.'s sister at another friend's residence on White Street in Toledo, Ohio. The attendees included several adult friends and their children. Appellant showed up at the party some time between 11:00 p.m. and midnight. He stayed for approximately 20-25 minutes and then left. Shortly after he left, the party concluded and A.D. prepared to go to sleep. She and her friends "triple locked" the door and then her two friends went upstairs to go to bed. A.D. remained on the ground floor where the adults had placed blankets on couches and the floor for her and the children to sleep. A.D. and one child fell asleep on the floor.

{¶ 22} A.D. awoke some time later to appellant touching and penetrating her vagina with his finger. She also noted that appellant had his penis out of his pants when she first saw him. She told him "I'm [A.D.], I'm [A.D.], I'm not [your girlfriend]." Appellant then "chuckle[d]," identified himself, and asked where his girlfriend was. A.D. declined to tell him because she didn't "know what his next move is." Appellant then got up, covered himself, and said "we're good." He then proceeded upstairs. Appellant asked one of the children who had woken up to go wake up their mother

9.

upstairs. A short time later, she heard a toilet flush and saw appellant come back down the stairs and leave.

{¶ 23} Next, A.D. ran upstairs to wake up the other adults in the residence. She then called 911 to report the incident. She spoke with the responding officers and then went to the hospital for a "rape kit" examination. She believed that the hospital performed a "gynecological exam" and took swabs of her genitals. The hospital also collected her clothing. A Toledo Police Detective arrived at the hospital and presented A.D. with a photo array. She identified appellant as the individual that had assaulted her.

{¶ 24} The testimony then turned to appellant's entry into the residence. A.D. identified several photographs of the residence where the incident occurred. She noted a window in a playroom that held an air conditioning unit. The unit was surrounded by an "accordion" panel that had been pushed aside, leaving a gap through the window. A.D. testified that the gap had never been there before and that she believed appellant had removed the entire unit to gain access to the residence but she denied having any actual knowledge of his point of entry. She concluded her direct examination stating that the experience made her feel "traumatized."

{¶ 25} Appellant began his cross-examination by asking A.D. about her belief that appellant entered through the playroom window. She confirmed that she had seen the window earlier that evening and that there was no gap between the accordion panel and the air conditioning unit. She agreed that appellant would not have fit in that gap with the air conditioning unit in place. She disputed that appellant would have had to cause damage inside the room if he had pushed the unit in to gain access to the residence,

10.

stating that he could have placed it down without damaging a table that was near the window. She did not go into the playroom after she contacted 911 and did not know who replaced the unit in the window if appellant had indeed removed it.

{¶ 26} A.D. next described her previous interactions with appellant. She acknowledged that she and appellant had argued in the past regarding how he treated his girlfriend. She claimed that appellant had done "scary things" to his girlfriend but conceded that she had never reported his behavior to the police. She denied any knowledge of an alleged relationship between appellant and S.B. She testified that appellant was allowed in S.B.'s house to visit S.B.'s sister. She estimated that S.B.'s house on Bronson Avenue, where the first incident occurred, and the White Street residence where her assault took place were approximately 10-15 minutes apart when traveling in a vehicle.

### Testimony of Lori Blevins, R.N.

{¶ 27} Lori Blevins is a registered nurse and is qualified as a Sexual Assault Nurse Examiner ("SANE"). She described her role as a SANE nurse as a "forensic nurse" that sees "all victims of violence, along with sexual assault victims of violence. This would include nonfatal strangulation, physical assaults, child abuse, child sexual assaults, adult sexual assaults, gunshot wounds, [and] burns." SANE examiners are able to collect evidence and offer victim supports services that other medical personnel cannot. They are also tasked with collecting evidence following a sexual assault and are mandated to report the assault to the appropriate authorities. At the time of trial, Blevins estimated that she had performed a SANE exam on at least 10 patients.

11.

{¶ 28} A SANE exam consists of a history and a physical exam. During the history, the examiner will discuss the patient's relevant medical history and obtain a description of the event warranting the exam. This allows the examiner to focus the physical exam on relevant portions of the patient's body that were subject to the assault to ensure that any potential evidence can be collected. After the history, the examiner proceeds with a physical exam. This includes an overall physical to identify injuries, "forensic photography" of the patient, and an examination of their "genital and anal areas." Blevins explained that a patient's demeanor during this exam can be varied as, for example, some will be distraught, crying, and avoiding talking, while others may "use humor to get through" their experience.

{¶ 29} During her testimony, Blevins was presented with Exhibit 9, which she identified as S.B.'s medical records from her July 6, 2022 examination. Blevins was working in her capacity as a SANE examiner that morning and was called to examine S.B. after she reported a sexual assault. Blevins described S.B.'s demeanor as "pleasant." S.B. informed Blevins that earlier that morning she awoke to an individual performing oral sex on her. She reached down, expecting to find her boyfriend, but did not feel her boyfriend's hairstyle. She pushed the individual away and told him to leave.

{¶ 30} This information prompted Blevins to conduct a gynecological exam of S.B. She took exterior swabs of S.B.'s vagina and included them in her rape kit examination. Blevins described the rape kit materials as evidence collected and sealed for testing by law enforcement. This includes, relevant to the present case, any swabs taken and the victim's clothing. The parties stipulated that the rape kit Blevins prepared

12.

during S.B.'s exam was authentic and had an appropriate chain of custody for evidence used at trial.

{¶ 31} On cross-examination, Blevins noted that she did not perform a toxicology screening during the exam because S.B. did not allege that her assault was "drug facilitated." Blevins did not offer S.B. any treatment because there were no physical injuries identified during the exam. She also confirmed that S.B.'s discussion as to how appellant entered the residence was speculation. She concluded her testimony by stating that not all rapes involve a physical injury but that it could be possible that an injury could result from a rape that only involved oral sex.

### Testimony of Mindy Lause, R.N.

{¶ 32} At all relevant times, Mindy Lause had worked as the manager of the forensic nursing program at St. Vincent's Hospital in Toledo, Ohio. She is a forensic nurse examiner and a SANE examiner. She clarified that forensic nurse examiners see victims of all violence while SANE examiners specialize in examining sexual assault victims. Having served as a SANE examiner since 2017, Lause estimated that she had performed over 200 examinations of sexual assault victims. These assaults do not always result in physical injuries but can create emotional harm.

{¶ 33} After describing her background, Lause was presented with Exhibit 10. She confirmed that the exhibit consisted of medical records related to her SANE examination of A.D. on July 6, 2022. A.D. came to the hospital for her exam at some time between 7:00 a.m. and 8:00 a.m. Lause described her demeanor as "calm and cooperative throughout the whole entire assessment, but there were several times where

13.

she was very tearful. A.D. "expressed frustration * * * [and] was kind of shooken up by it." During the examination, A.D. told Lause that she woke to someone touching her vagina. A.D. "immediately pulled back, screamed" and "told the person that she wasn't the person they were looking for." Lause then performed a physical exam and noted that A.D. had no physical injuries. Lause also gathered evidence for the rape kit, including collecting the "standard swabs" pursuant to "Ohio protocol." The parties stipulated that the rape kit Lause prepared during A.D.'s exam was authentic and had an appropriate chain of custody for evidence used at trial.

{¶ 34} On cross-examination, Lause again confirmed that A.D. had no physical injuries. She also noted that A.D. reported no pain and that she was comfortable returning home following her discharge. Lause did not seek any further details regarding her assailant's exit from the residence.

## Testimony of Officer Mattison Grimsley

{¶ 35} At the time of trial, Officer Mattison Grimsley had been employed by the Toledo Police Department for 1.5 years. Her typical job duties involve responding to service calls or anything that she sees that needs to be addressed to ensure community safety.

{¶ 36} On July 6, 2022, Grimsley and her partner, Officer Andrew Yarnell, were dispatched to respond to a burglary and sexual assault at a residence on Bronson Avenue in Toledo, Ohio. The dispatch occurred at approximately 4:30 in the morning. When the officers arrived, the victim—S.B.—was on the front porch. Grimsley asked her "various questions" and then searched the perimeter of the residence to determine how the

14.

individual gained access. She did not find any doors or windows that had been damaged and was unable to find the point of entry. Grimsley's body camera footage was then played for the jury without objection. At the conclusion of the footage, Grimsley confirmed that she contacted the Toledo Police Department's detective bureau for further investigation and then drove S.B. to the hospital. She had no involvement in the ensuing investigation.

{¶ 37} During her cross-examination, Grimsley testified that she arrived at the Bronson Avenue residence at approximately 4:45 a.m. She was at the residence for 1.5 hours before taking S.B. to the hospital. While trying to determine the point of entry, S.B. informed Grimsley that the door had been left unlocked. Grimsley again stated that she could not identify the point of entry but confirmed that S.B. identified appellant as the intruder.

### Testimony of Officer Mark Smith

{¶ 38} Officer Mark Smith testified that at the time of the incident, he had been employed with the Toledo Police Department for 11 years. In that time, he served as a street officer that is primarily tasked with responding to service calls. He was serving in this capacity when he responded to a 911 call reporting an assault at a residence on White Street in Toledo, Ohio. When he arrived, he spoke with A.D. who informed him that she had been assaulted by appellant. Smith's body camera footage was then played for the jury without objection. He confirmed that it accurately represented his discussion with A.D. He then testified that he informed the detective of the information he learned,

15.

including A.D.'s identification of appellant, for further investigation. Smith did not identify appellant's point of entry during his response to the call.

{¶ 39} During appellant's cross-examination, Smith confirmed that the report he prepared included a description of a cut screen on a first-floor window as a possible point of entry. He was not asked to explain how he came to this conclusion. Smith stated that after he finished questioning A.D. at the residence he took her to the hospital. He was not involved in any subsequent investigation and did not take any photographs of the scene.

### Testimony of Natalie Montecalvo

{¶ 40} Natalie Montecalvo serves as a resource officer for the Lucas County Sheriff's Office. In that role, she is tasked with monitoring inmate calls at the Lucas County Jail. At the time of appellant's arrest, the jail used a phone system that allowed for individuals outside of the jail to purchase prepaid phone time to speak with inmates. All calls are recorded. Relevant to the present appeal, Montecalvo downloaded the recording of a phone call appellant made to an individual outside of the jail facility. The recording was played for the jury without objection from the appellant. During the call, appellant discussed the charges stating that he had "only touched [A.D.'s] leg" and that he was more concerned with the allegation that he had raped S.B. Later in the call, he suggested that he was only reiterating what he had been told he was accused of. He also asked the recipient of the call to arrange a meeting with S.B. and if he could do so he would be "blessed." Montecalvo confirmed that the phone call was made using a PIN number assigned to appellant in the jail's phone system.

16.

{¶ 41} On cross-examination, Montecalvo confirmed that she had never heard appellant speak and, therefore, would be unable to identify appellant by voice in the recorded call. She also acknowledged that inmates have used other inmates' PIN numbers for calls in the past. She was unable to provide the date of the recorded phone call without referencing her records—and neither party asked her to do so—but testified that it was recorded in 2022, prior to the jail's utilization of a new phone recording service. Montecalvo also agreed that she could not form any opinions about the purpose of appellant's statements on the call or the status of the ongoing investigation, stating that she was "just here for how the phone system works and providing the calls."

### Testimony of Lindsey Deetz

{¶ 42} Lindsey Deetz is a forensic scientist in the DNA Section at the Ohio Bureau of Criminal Investigation (BCI) lab in Richmond, Ohio. Her primary duties are to examine evidence to test for body fluids that can be used to collect DNA. She then forwards those samples for testing, prepares a report with her conclusions, and testifies at trials regarding those conclusions. Deetz was qualified as an expert witness in forensic DNA over appellant's objection.

{¶ 43} Deetz began her expert testimony describing the manner in which DNA is analyzed. It is first received in her lab from the collecting agency and is catalogued with a case-specific identification number. The analysis consists of multiple steps in which the swabs are first placed in small tubes for extraction of any DNA. She then determines how much DNA evidence was collected to determine whether she needs to perform an "amplification" or copying of the DNA. She then prepares a "DNA profile" that allows

17.

her to compare it to a "known standard"—a DNA sample provided by a known individual as part of an investigation. If she determines that there is a profile match, she then determines the statistical likelihood of that match and prepares a report with her conclusions. She noted that not every sample that is submitted can be compared to a known DNA standard because several factors, including how much DNA was initially left as evidence for a sample, the time between when the DNA was left and when it was collected, and where the DNA was left.

{¶ 44} Deetz was then presented with Exhibit 13. She confirmed that the exhibit consisted of her report related to the rape kit collected during A.D.'s SANE examination. When the case was originally submitted to her lab, it contained the swabs from the rape kit and a known standard collected from appellant. She analyzed the samples through the procedure described above and concluded that appellant was not a contributor to DNA collected from swabs of A.D.'s underwear. There was additional DNA present on those swabs but the amount was insufficient for comparison. The swabs from A.D.'s vagina and both of her thighs showed that there was no DNA profile present other than A.D.'s.

{¶ 45} Deetz next testified, on cross-examination, the five-week lapse between the lab's receipt of the samples on July 12, 2022, and her final report on August 25, 2022, was "on the longer end of [the lab's] typical turn-around time." She was unable to provide a specific time that DNA lasts for testing, attributing the ability for it to survive on several factors including, for example, how much was initially left and whether the individual from whom the collection was taken had showered. She reiterated her

18.

conclusion that none of the DNA collected as part of A.D.'s rape kit from which she could identify a profile matched appellant's DNA profile.

{¶ 46} The state then conducted a brief redirect examination of Deetz. At that time, Deetz testified that not every physical touch of another person's body would be expected to result in them leaving identifiable DNA.

### Testimony of Samuel Troyer

{¶ 47} Samuel Troyer is a forensic scientist in the DNA and Forensic Biology Sections of the BCI. In the DNA section, he analyzes evidence to determine whether it contains DNA and, if so, compares the evidence to known DNA profiles. After describing his qualifications, the trial court qualified Troyer as an expert in forensic DNA analysis without objection from appellant.

{¶ 48} Troyer stated that DNA is useful in identifying individuals through their own unique DNA profile. In the present case, he was asked to analyze any DNA found in the rape kit with samples collected from S.B. He began his analysis by reviewing the evidence to determine whether any DNA had been identified. He agreed with Deetz that not all touches result in the individual leaving DNA and whether they did depended on several factors. From S.B.'s rape kit, he was able to identify the presence of two major contributors of DNA to the swab of the lower panel of S.B.'s underwear. He determined that the DNA profile from one contributor was S.B. He determined that appellant was not a major contributor to the DNA found on the swab. He identified the presence of an additional DNA contributor but the sample was too small to make any comparisons.

19.

{¶ 49} Troyer reached a similar conclusion regarding the DNA found on the swab of the front panel of S.B.'s underwear—that is, the presence of two major contributors but that he could not identify appellant as one of the major contributors. This result, he continued, also occurred from the remaining swabs of the back panel of S.B.'s underwear as well as the swabs taken from her body. He concluded his direct testimony by stating that finding S.B. as the major contributor does not eliminate appellant as one of the contributors of the untestable DNA.

{¶ 50} On cross-examination, Troyer elaborated on the conclusion that appellant was not a major contributor. He explained that if he recovers DNA sufficient to develop a profile, he must compare that profile to the standards that are submitted and conclude whether the individual providing that standard was or was not a major contributor to the evidence collected.

### Testimony of Stacy Violi

{¶ 51} Stacy Violi described her job with the BCI as someone who "write[s] DNA reports." At the time of trial, she had been in that position for over 22 years. To develop these reports, she compares profiles from DNA samples collected during investigations with known samples. She testified that in addition to her general education and background training, she also received specialized training in "Y-STR" analysis. The trial court qualified her as an expert witness in DNA analysis without objection from appellant.

{¶ 52} Violi began her testimony describing the difference between standard DNA analysis and Y-STR analysis. This involved testing of only the "Y" chromosome of

20.

DNA samples. Since only males have a Y chromosome, the test allows the analysis to test only male DNA present in a sample. Y-STR analysis is used in cases "where there is an overwhelming amount of female DNA present, which is the case for most intimate samples that would be found in a sexual assault, it ignores all the female DNA there * * * So it makes it easier to detect any kind of foreign DNA." She noted that the same limitations of general testing for DNA also applied to Y-STR in that there must be a sufficient sample size from which to establish a profile before a comparison can be made to a known profile. She also explained that because the Y chromosome is only inherited from an individual's father, that the statistical probabilities established once a sample matched a known standard would be inclusive of the individual providing the known standard profile and their "paternal relatives."

{¶ 53} Violi then turned to the testing she performed in the underlying case. She explained that she found one sample taken from the back panel of A.D.'s underwear that was "eligible for Y-STR testing." She found that the sample contained male DNA but that it was insufficient to create a profile that could be matched to appellant's sample. As to S.B.'s rape kit, Violi found that the swabs of S.B.'s genitals contained a sufficient sample of male DNA to establish a profile and that the profile matched the sample collected from Wilson. As a result, she concluded that appellant or one of his paternal relatives could not statistically be excluded as a "major contributor" to the DNA sample collected from S.B.'s body.

{¶ 54} During her cross-examination, Violi was asked about another male listed in her report on S.B., in addition to appellant, as a "subject" of her analysis. She explained

21.

that the individuals listed as subjects include anyone associated with a certain DNA profile in the state's database. This additional subject would have come from a "state hit notification" that associated the individual's profile with the profile developed during the initial testing. There was no sample provided for this other individual and she did not seek one to perform a Y-STR test on his DNA because she had already reached her conclusion that neither appellant nor his male relatives could be excluded as a contributor of the male DNA found on S.B.'s body.

### Testimony of Detective Isreal Garrett

{¶ 55} Detective Isreal Garrett serves as a detective in the Toledo Police Department's Special Victims Unit ("SVU"). At the time of his testimony, he had been with the department for 23 years. He described the SVU as handling "specifically sex crimes" with "some domestic violence crimes as well." Investigations of those crimes typically begin with a patrol officer responding to a call and conducting preliminary interviews to gather information. That information is then passed on to the detective who completes the investigation.

{¶ 56} Garrett was assigned to investigate the present cases on the morning of July 6, 2022. He initially received the assignment some time prior to 7:00 a.m. when his sergeant informed him that a rape had been reported on Bronson Avenue in Toledo, Ohio. He proceeded to the hospital to begin his investigation when he was told that another rape had been reported. He testified that he spoke to both victims at the hospital and both reported that appellant had committed the offenses.

22.

{¶ 57} Garrett next testified about the steps he took and did not take in the course of his investigation. He noted that he did not take fingerprints at the scene of S.B.'s rape because she could not identify a point of entry and the responding officers did not initially see any damage to the residence. He did not take any photographs for the same reason. He also found that there were no visible security cameras with a view of the residence. He did not believe that searching for any other cameras was necessary as both victims had identified appellant as the perpetrator. He did have pictures taken of A.D.'s residence. Although he could not be certain which victim provided the information, he testified that he was made aware of a van that one of them believed appellant may have been driving.

{¶ 58} Garrett then explained that he did not follow up on the van as he was having a photo array prepared for the victims to see if they could identify appellant. After another officer presented the women with the photo array and both identified appellant, Garrett shifted his focus to finding appellant. The photo arrays were admitted into evidence without objection from appellant.

{¶ 59} Appellant began his cross-examination of Garrett by questioning him about the time it takes to travel between the Bronson Avenue and White Street residences. Garrett, after confirming his familiarity with the shortest route between them, testified that he believed it would take approximately 5 minutes to travel between them at the time of day during which the incidents occurred. He was unaware of any cameras along the route he described and stated that he did not see any security cameras at either residence.

23.

{¶ 60} Garrett next testified that he went to the White Street residence—the site of A.D.'s assault—after interviewing the victims at the hospital. His report indicated that appellant entered the residence through a cut in the screen of an open window that contained an air conditioning unit. He estimated that the cut in the screen was 8 inches. He could not speculate on the circumstances of how appellant had removed the air conditioning unit and entered through the cut screen, stating that it was the responding officer's opinion that this was the point of entry based on their discussion with A.D. He agreed that there was no visible damage to indicate that the air conditioning unit fell but testified that he did not believe the unit being removed would necessarily result in damage. He conceded that he did not know appellant's point of entry.

{¶ 61} Appellant then questioned Garrett about the investigation following the initial interviews with the victims. Garrett testified that he did not dust for fingerprints at either location because he did not know the point of entry. He then stated that once he heard appellant's phone call from jail in which he stated that he had touched A.D.'s leg that he did not need any additional information to identify the perpetrator. He agreed that the jail call came after he made appellant aware of the allegations against him during their initial interview.

{¶ 62} On redirect, Garrett concluded that appellant's jail call showed that he was asking someone to pay the victims not to appear and that he was admitting to touching A.D.'s leg while she was sleeping. He also explained that he did not need fingerprints or to seek out security cameras as part of his investigation because both victims had

24.

identified appellant as the person that assaulted them through photo arrays. He also confirmed appellant's identity through the conclusions made from the Y-STR testing.

**The state rests, appellant's motion for acquittal, and appellant's alibi defense**

{¶ 63} The state rested its case-in-chief at the conclusion of Garrett's testimony. Appellant then moved for acquittal on each count. As to count 1, the aggravated burglary into S.B.'s residence, appellant argued that the state did not introduce evidence to show that appellant lacked privilege to enter into the property. For count 2, the rape of S.B., appellant argued that because he did not commit the aggravated burglary he could not have committed the rape offense. Appellant argued that the state failed to introduce sufficient evidence to support count 3, the burglary into the residence where A.D. was sleeping, because it again failed to show that appellant lacked privilege to enter into the property. Finally, as to count 4, the gross sexual imposition of A.D., appellant again argued that the state's failure to introduce sufficient evidence of the burglary necessitated acquittal on the gross sexual imposition offense.

{¶ 64} In response, the state argued that S.B.'s testimony that appellant did not have permission to be in the residence was sufficient to prove the aggravated burglary in count 1. Further, the state argued that S.B.'s testimony was sufficient to prove the rape offense described in count 2 as she described the event and identified appellant as the perpetrator. The state argued that it had introduced sufficient evidence to prove count 3's burglary offense because A.D., as an occupant of the residence, could confirm that appellant lacked privilege to enter the property. Finally, the state argued, without

25.

specification, that it had introduced sufficient evidence to prove the gross sexual imposition of A.D. as described in count 4.

{¶ 65} The trial court denied appellant's motion as to all four counts. It then discussed appellant's Fifth Amendment Right not to testify. Appellant confirmed that he wished to testify in his own defense. The state then sought to limit appellant's ability to testify regarding any potential alibi for the morning of the offenses because he had not filed the required notice under Crim.R. 12.1 to permit him to present an alibi defense. Appellant argued that he should be permitted to present his alibi defense in the interest of justice, as permitted by the rule, because he had informed Garrett that he was not at either residence at the time the offenses were committed during their interview. The trial court held that appellant could testify that he was not at the scene of each crime but that because he had not filed the required notice, he could not offer any evidence showing where he claimed to be that morning. Appellant then proceeded with his case-in-chief, during which he offered the following testimony:

### Testimony of appellant

{¶ 66} Prior to the underlying incidents, appellant had been in a relationship, intermittently, with S.B.'s sister. He had known S.B. for approximately one year, having been introduced to her through that relationship. He stated that he never lived at S.B.'s residence on Bronson Avenue but had spent the night there on previous occasions. S.B.'s sister had moved out of the residence in April, 2022. He testified that he would also visit the residence on White Street where A.D. was staying at the time of the incidents for "get-togethers." His relationship with S.B. at the time of the incidents consisted of

26.

"hanging out" occasionally. He stated that on July 5, 2022, he picked S.B. up and took her to his house where she smoked marijuana and they went upstairs to have sex. However, when S.B. asked him for money in exchange for sex, he declined and drove her home.

{¶ 67} He then went to the White Street residence to attend a gathering for S.B.'s sister's birthday. As had happened in the past, he got into an argument with A.D. and some of her friends about his relationship with S.B.'s sister. He left the White Street residence at approximately 12:20 a.m.

{¶ 68} He denied being at the Bronson Avenue and White Street residences on the morning of July 6, 2022. The following day, the police "kick[ed his] door," arrested him, and took him to the Toledo Police Department SVU office on Sylvania Avenue in Toledo, Ohio. There, he met with Garrett who informed him of the allegations against him. He was then taken to jail. He made a phone call later that day to his son and another unnamed individual. During that call, he told his son about the allegations, stating "I just toucher her leg thinking she was somebody else. * * * I was referring to what the officer told me." When asked at trial if he was admitting that he touched A.D.'s leg, he stated "[n]o, I'm just saying what they said that I supposed to have done allegedly done." He also stated that his reference to "paying the bitch" during the phone call was in reference to a past event in which he had paid S.B. to have sex with him and not an attempt to prevent the victims from testifying.

{¶ 69} The state began its cross-examination of appellant by confirming that he agreed that if the conduct he was alleged to have committed were true, that it would

27.

constitute the criminal offenses for which he was charged. Appellant also agreed that he did not have permission to enter either the Bronson Avenue or White Street residences and doing so would constitute a trespass. He conceded that when he discussed touching A.D.'s leg during the recorded phone call that he did not initially reference his discussion with Garrett. He again denied asking anyone to encourage the victims not to testify. He testified that the reason the victim's claim that he committed these offenses was to "bring [him] down" because they did not like him. Lastly, appellant testified that the Y-STR testing did not show the DNA found in S.B.'s rape kit was consistent with him because the BCI did not compare it to any other males.

**Appellant rests and renews his motion for acquittal, parties make closing arguments**

{¶ 70} Appellant rested his case-in-chief at the conclusion of his testimony. He renewed his motion for acquittal, reasserting the same arguments from his original motion. The state offered no argument in response and the trial court denied appellant's motion. The parties then proceeded with closing arguments before the matter was submitted to the jury.

## Jury verdict and sentencing

{¶ 71} The jury found appellant guilty on all four counts in the indictment. The trial court ordered appellant to participate in a pre-sentencing investigation and set the matter for sentencing on May 24, 2023.

{¶ 72} At sentencing, the trial court determined that counts 1 and 2 were allied offenses pursuant to R.C. 2941.25(A) and were merged for sentencing. The state elected to have appellant sentenced on count 2, the rape of S.B. Pursuant to R.C.

28.

2929.14(A)(2)(a), the trial court ordered appellant to serve an indefinite prison term of a minimum of 11 years and a maximum of 16.5 years on count 2. The trial court ordered appellant to serve a prison term of 8 years on count 3, burglary, and a prison term of 18 months on count 4, the gross sexual imposition of A.D. The trial court then ordered appellant to serve the sentences consecutively for an aggregate, indefinite prison term of a minimum of 20.5 years and maximum of 25.5 years.

## B. Assignments of Error

{¶ 73} Appellant timely appealed from the trial court's judgment and assigns the following errors for our review:

1. The court erred when it denied appellant's request for a continuance to hire an attorney;

2. The court erred when it denied appellant's ability to argue alibi;

3. Appellant received ineffective assistance of counsel when counsel failed to file notice of alibi; and

4. The conviction is against the manifest weight of the evidence, and there was not sufficient evidence to support a conviction.

{¶ 74} The state timely filed a cross-appeal and assigns the following error for our review:

1. As to [appellant's] conviction for burglary, a violation of R.C. 2911.12(A)(2) and (D), a felony of the second degree (count 3), the trial court was required to impose an indefinite sentence in accordance with R.C. 2929.14(A)(2)(a) and 2929.144(B)(2).

We address these errors in turn.

29.

## II. Appellant's Assignments of Error

### a. The trial court did not err when it denied appellant's motion to continue the trial.

{¶ 75} In his first assignment of error, appellant argues that the trial court erred in denying the motion to continue he made the morning his trial began. In support of his argument, appellant cites the purported deterioration of his relationship with trial counsel beginning with the April 28, 2023 pretrial. At that time, appellant sought to fire trial counsel based on his refusal to file certain motions appellant requested and for not seeing appellant in jail to prepare him for trial. Appellant requested a continuance of the trial in order to retain private counsel. The trial court denied that motion.

{¶ 76} When the parties reconvened for trial on May 2, 2023, appellant again requested a continuance to retain private counsel. He argued that trial counsel had not helped him to prepare a defense but only went over the state's evidence with him. The trial court again denied his motion to continue. Appellant argues that this denial was error as he has the right to choose his own counsel and, in turn, violated his due process right to prepare for and to receive a fair trial. We disagree.

{¶ 77} "The decision whether to grant a continuance resides in the sound discretion of the trial court, and it will not be disturbed absent an abuse of discretion." *State v. Perez,* 2018-Ohio-1956, ¶ 13 (6th Dist.). An abuse of discretion occurs when the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217 (1993). "Whether a denial of a continuance is so arbitrary as to violate due process is dependent on the circumstances presented and, in particular,

30.

the reasons presented to the trial judge at the time the request is denied." *Perez* at ¶ 14. "Of specific interest is whether the motion states a legitimate purpose or if it is dilatory, purposeful, or contrived." *Id.*

{¶ 78} The record shows that appellant first expressed dissatisfaction with his counsel's representation at the pretrial on April 14, 2023. Appellant had filed two pro se motions despite being represented by counsel. Appellant informed the trial court that he filed the motions himself because counsel declined to do so. The trial court informed appellant that he could not file motions since he was represented by counsel.

{¶ 79} At the April 28, 2023 final pretrial, appellant sought to "fire" his trial counsel for failing to prepare a defense. He claimed that trial counsel had not visited him in months before admitting to the trial court that counsel had visited him two weeks prior. He continued to express frustration with trial counsel and told the trial court he would prefer to retain his own counsel. The trial court informed appellant that he was welcome to do so but until then, he would continue with his appointed trial counsel.

{¶ 80} Finally, on the morning of trial, appellant moved to continue the trial, again arguing that trial counsel had not prepared a defense and that he needed more time to retain private counsel. The trial court concluded that appellant had sufficient time to retain counsel, particularly in light of the fact that trial had been set weeks prior. The trial court denied the motion to continue and the matter proceeded to trial.

{¶ 81} Reviewing the circumstances through which appellant requested the continuance, we cannot say that the trial court's denial of that motion was arbitrary, unreasonable, or unconscionable. Appellant's primary complaint was that trial counsel

31.

failed to visit him or prepare a defense.  When questioned on these issues, appellant immediately conceded that counsel had visited him and reviewed evidence with him. Appellant also argued that he needed time to retain trial counsel yet, despite having several months to contact private counsel, appellant offered no information as to his efforts to retain counsel and no counsel had entered an appearance on his behalf.  Put simply, appellant's request for a continuance to allow him to retain new counsel despite having made no effort to do so in the weeks prior to trial, and by manufacturing unsupported complaints about counsel's performance, shows that his request for a continuance was not for a legitimate purpose.

{¶ 82} For these reasons, we find that the trial court's denial of appellant's motion to continue was not arbitrary, unreasonable, or unconscionable.  As a result, the trial court did not abuse its discretion when it denied appellant's motion and we find his first assignment of error not well-taken.

### b. The trial court did not err when it denied appellant's request to argue that he had an alibi for the morning of the offenses.

{¶ 83} In his second assignment of error, appellant argues that the trial court erred when it precluded him from arguing that he had an alibi for the morning of July 6, 2022. CrimR. 12.1 states:

> Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, the defendant shall, not less than thirty days before trial in a felony case and fourteen days before trial in a misdemeanor case, file and serve upon the prosecuting attorney a notice in writing of the defendant's intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the

32.

purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.

It is undisputed that appellant did not file the notice of alibi required under Crim.R. 12.1. He argues, however, that the trial should have allowed him to testify regarding his claimed alibi in the interest of justice and that the trial court's exclusion of his alibi evidence was erroneous.

{¶ 84} "The issue of whether a defendant is permitted to present an alibi defense where he fails to follow the provisions of Crim.R. 12.1 lies within the sound discretion of the trial court." *State v. Silvey,* 2007-Ohio-2535, ¶ 32 (6th Dist.). "Crim.R. 12.1 should be construed liberally and not be applied where no prejudice would accrue to the prosecution, where there is a demonstrable and excusable showing of merely negligence, or where there is good cause shown." *Id.*

{¶ 85} Initially, we note that appellant never proffered the testimony he alleged would have provided him an alibi defense at the time the trial court excluded it. His argument to the trial court was that he had initially informed Detective Garrett that he had an alibi during their initial interview. This, he argued, shows that the state was aware of the claimed alibi defense well in advance of trial and would not suffer prejudice if he had been allowed to testify regarding his alibi at trial. Even assuming that this was true, we cannot say that the state would have suffered no prejudice had he been allowed to present an alibi defense.

{¶ 86} The first reference to the proposed alibi defense in the record was during the January 6, 2023 pretrial. At that time, appellant's trial counsel requested a

33.

continuance of the forthcoming trial, in part, to afford him an opportunity to investigate potential alibi witnesses appellant had recently discussed with him. The trial court granted a continuance, on other grounds, providing appellant with several months to develop the claimed alibi defense. It was not until the middle of trial that the state became aware that appellant intended to present his alibi defense, preventing it from preparing to cross-examine him on the claimed alibi. Additionally, due to the lack of a proffer, we cannot determine what appellant intended to testify or whether that testimony would match the alibi he purportedly provided to Detective Garrett. It is this unknown possibility that both shows the prejudice to the state and, accordingly, emphasizes the purpose of the notice rule.

{¶ 87} The U.S. Supreme Court commented on this risk in *Williams v. Florida,* 399 U.S. 78 (1970), stating:

> Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played.

*State v. Jamison,* 49 Ohio St.3d 182, citing *Williams.* In *Jamison,* similar to the present case, the defendant attempted to introduce an alibi defense, without prior notice, "only at the eleventh hour" after the state rested. *Jamison* at 187. The court affirmed the trial court's exclusion of alibi evidence based on the prejudice to the state. *Id.* Here, appellant's prior representation that it had witnesses to support his alibi defense, witnesses that could have been vetted with proper notice, but then to only offer his own

34.

testimony at trial falls squarely within the risk of fabrication described in *Jamison* and the prejudice to the state in attempting to refute appellant's claimed alibi without any notice.

{¶ 88} For these reasons, we find that the trial court did not err in refusing to allow appellant to present an alibi defense at trial after failing to provide the required notice. Therefore, we find that the trial court did not abuse its discretion in reaching its decision and we find appellant's second assignment of error not well-taken.

### c. Appellant's failure to proffer the anticipated alibi evidence precludes this court from reviewing his ineffective assistance of counsel claim.

{¶ 89} In his third assignment of error, appellant argues that he received ineffective assistance of counsel when his trial counsel failed to file a notice of alibi pursuant to Crim.R. 12.1. In order to succeed on a claim of ineffective assistance of counsel, appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* v. *Washington,* 466 U.S. 668, 687–688 (1984). Appellant can establish prejudice by showing that there is a reasonable probability that, "but for counsel's errors, the result of the proceeding would have been different." *State v. Hutton,* 2003-Ohio-5607, citing *Strickland* at 687-688. "It is basic to appellate practice that error in the form of excluded testimony is not reviewable unless there has been a proffer of the excluded testimony or the content of the testimony is apparent from the circumstances." *State v. Goffee,* 2005-Ohio-2596, ¶ 34 (5th Dist.); *see also State v. Ryan,* 2018-Ohio-4739, ¶ 29 (5th Dist). As noted above,

35.

appellant did not proffer the testimony he intended to offer had he been permitted to testify. As a result, we cannot determine if there is a reasonable probability that had the trial court permitted him to testify that the result of the trial would have been different. *Hutton* at ¶ 44.

{¶ 90} Appellant recognizes the lack of proffer but, citing *State v. Deal,* 17 Ohio St.2d 17, 20 (1969), argues that we should remand the matter to the trial court to consider whether his potential testimony would have changed the result of the trial. We reject appellant's argument as his reliance on *Deal* is misplaced. In *Deal,* the Ohio Supreme Court remanded a matter to the trial court to fully consider whether defendant's concerns regarding his counsel's performance ahead of trial deprived him of the effective assistance of counsel when the trial court only made limited inquiry into those complaints. *Id.* at 17. This remedy is available only in cases where a trial court's failure to adequately consider a defendant's complaints impacted their right to counsel. *State v. Johnson,* 2006-Ohio-6404, ¶ 68. The requested remedy is unrelated to a defendant's failure to proffer excluded testimony and is inapplicable to the present appeal.

{¶ 91} In sum, we cannot determine whether appellant's trial counsel was ineffective for failing to file the notice of alibi because the evidence that could show prejudice was not proffered. As a result, we find his third assignment of error not well-taken.

36.

**d. The state introduced sufficient evidence to support appellant's convictions and those convictions were not against the manifest weight of the evidence.**

{¶ 92} In his fourth assignment of error, appellant argues that the state failed to introduce sufficient evidence to show that appellant committed the burglary offense at the White Street residence and that each of his convictions were against the manifest weight of the evidence. We address appellant's sufficiency argument first.

{¶ 93} When determining whether the state introduced sufficient evidence to support a conviction, "the relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). The court does not weigh the evidence or assess the credibility of the witnesses under this standard. *State v. Were*, 2008-Ohio-2762, ¶ 132. "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 94} Appellant argues that the state failed to introduce sufficient evidence to support his burglary conviction related to his entry into the White Street residence on July 6, 2022. Specifically, he argues that the state's failure to elicit testimony from the property owner that appellant lacked privilege to enter showed that it did not introduce sufficient evidence to show that he had trespassed into the residence, a necessary element of burglary as described in R.C. 2911.12(A)(2).

{¶ 95} At trial, A.D. testified that she had gone to sleep in the living room as a guest at the residence on White Street after a party on July 5, 2022. Before going to bed,

37.

she and her friends "triple locked" the door. She also noted that after appellant had exited the residence, that she noticed a window with an air conditioning unit now had a gap that she had not previously observed, leading her to believe that appellant gained access through that window. Further, during her discussion with the responding officers, she claimed that appellant had broken into the home.

{¶ 96} Weighing this evidence in a light most favorable to the state, we find that a rational trier of fact could find that the trespass element of the burglary offense could be established beyond a reasonable doubt. The residence was secured at the time of the offenses and A.D. offered testimony suggesting that appellant had entered the residence without permission to do so. While appellant correctly notes that the owner of the residence was not called to testify regarding appellant's lack of privilege, he cites no authority, and we could find no authority, that requires the testimony of the individual that can exclude an individual from the premises in order to support a trespass conviction. For these reasons, we find that the state introduced sufficient evidence that appellant lacked privilege to enter the White Street residence on July 6, 2022. Thus, a rational trier of fact could find that he committed the trespass necessary to satisfy the burglary offense for which he was convicted.

{¶ 97} We next turn to appellant's argument that the jury's verdict on each of his convictions was against the manifest weight of the evidence. When reviewing whether a verdict is against the manifest weight of the evidence, we act as a 'thirteenth juror' and must "weigh the evidence and consider the credibility of the witnesses." *State v. Lockett,* 2003-Ohio-3101, ¶ 13 (6th Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380. "[O]nly

38.

if the appellate court concludes that the jury clearly lost its way in resolving conflicts in evidence or created a manifest miscarriage of justice may the court reverse a conviction and order a new trial." *Id.*

{¶ 98} Appellant makes three arguments as to why his convictions were against the manifest weight of the evidence. First, he argues that the jury should have acquitted him of all the offenses based on his testimony that S.B. and A.D. disliked him so much that they conspired to have him arrested by reporting assaults that did not occur. Second, he argues that the jury should have found that he did not have time to commit these offenses because he could not have traveled from Bronson Avenue to White Road to commit the offenses in the duration of time between the 911 calls. Lastly, he argues that because the DNA evidence only showed that he could not be eliminated as a major contributor following Y-STR testing of the sample collected from S.B., and because there was no DNA evidence found linking him to the samples from A.D.'s rape kit, that the jury lost its way in finding him guilty.[4] We address these arguments in turn.

---

[4] We note appellant's argument that since his conviction for the rape of S.B. was against the manifest weight of the evidence that the jury's verdict on the aggravated burglary charge was also against the manifest weight of the evidence. That offense required him to have caused physical harm while committing a burglary in order to be convicted under R.C. 2911.11(A)(1) and since, he argues, no rape occurred there could not have been an aggravated burglary. Appellant's aggravated burglary offense was merged with the rape offense at sentencing and the state elected to have him sentenced for the rape. Because he was not sentenced for aggravated burglary, he was not convicted of that offense and this court lacks jurisdiction to review the jury's verdict. *State v. Stuart,* 2025-Ohio-2420, fn. 3 (6th Dist.), citing *State v. Whitfield.* 2010-Ohio-2; *State v. Worley,* 2016-Ohio-2722, ¶ 23 (8th Dist.).

39.

{¶ 99} First, appellant's argument that the two victims conspired against him was raised at trial through his testimony. He explained that both women disliked him and that he had argued with both of them in the past, contrary to their testimony that he committed the offenses. As a result, he argues that his conviction was against the manifest weight of the evidence because the jury did not believe his testimony. "[I]t is well-established that 'a conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'" *State v. Talley,* 2016-Ohio-8010, ¶ 23 (8th Dist.), citing *State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.). Thus, appellant's argument that the jury should have believed his testimony over the victims' does not equate to his conviction being against the manifest weight of the evidence.

{¶ 100} Appellant's second argument, that he did not have time to commit both offenses, does not show that the jury lost its way. The testimony related to the timing between the offenses was limited to A.D.'s testimony that the residences were 10-15 minutes apart by car and detective Garrett's testimony that at that time of day, between 4:00 a.m. and 5:00 a.m., that the distance could be traveled in approximately 5 minutes. It is undisputed that the 911 calls were made 33 minutes apart. Under either estimate, appellant could have left the Bronson Avenue residence and reached the White Street residence with 18 or 28 minutes left to commit the second offense. Moreover, appellant's argument, if believed, could only serve to negate one of the convictions as either could have been committed independently of the other. As a result, we cannot say that the jury lost its way in disregarding appellant's theory that the commission of both offenses was impossible.

40.

{¶ 101} Finally, appellant argues that his conviction was against the manifest weight of the evidence because the DNA evidence did not positively identify him as a major contributor to the sample from S.B.'s rape kit and because there was no DNA evidence linking him to A.D.'s rape kit. We agree with appellant that Violi's testimony regarding whether appellant could be identified as a major contributor to the DNA found in S.B.'s rape kit through Y-STR testing could have created some confusion. The state's questioning arguably suggested that the Y-STR testing identified appellant as a major contributor to the DNA collected in S.B.'s rape kit. Appellant's counsel elicited testimony that clarified appellant and his paternal male relatives could not be eliminated from being major contributors, not that he *was* a major contributor. Therefore, any potential confusion created by the state's questioning was clarified by his own counsel and we cannot say that it misled the jury.

{¶ 102} Having reviewed the record, we find that any potential misstatements of the DNA evidence that could have misled the jury is outweighed by the remaining evidence presented at trial supporting its guilty findings. Both of the victims testified that they woke up to appellant assaulting them. They immediately identified appellant as the perpetrator and pushed him away. Both victims recounted the details of their assaults in their 911 calls and both identified appellant from a photo array later that morning. The jury also heard appellant's phone call in which he stated that he had only touched A.D.'s leg but did not assault her, suggesting that he was present at the residence. The lack of positive identification of appellant through DNA evidence, particularly in light of expert testimony that the nature of these offenses did not always result in DNA being left

41.

behind, does not outweigh the evidence the state did introduce at trial to show that appellant committed the underlying offenses. As a result, we cannot say that the jury lost its way and we find that appellant's convictions were not against the manifest weight of the evidence.

{¶ 103} In sum, we find that the state introduced sufficient evidence to support appellant's trespass offense. Further, we find that appellant's convictions for the rape of S.B., the gross sexual imposition of A.D., and the burglary at the White Street residence are not against the manifest weight of the evidence. Appellant's fourth assignment of error is found not well-taken.

### III. The State's Cross-Assignment of Error.

### a. The trial court erred when it failed to impose an indefinite sentence on appellant's burglary offense pursuant to R.C. 2929.14(A)(2)(a).

{¶ 104} At sentencing, the trial court ordered appellant to serve an 8-year prison term on his burglary offense. The state filed a cross-appeal, arguing that the trial court erred when it failed to impose an indefinite prison term on appellant's burglary offense. We agree.

{¶ 105} We review felony sentencing challenges under R.C. 2953.08(G)(2). *State v. McIntoush,* 2024-Ohio-2284, ¶ 14 (6th Dist.). R.C. 2953.02(G)(2) provides that appellate courts may "increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing" if it finds, in relevant part, "that the record does not support the sentencing court's findings" under R.C. 2929.14(C)(4) or "that the sentence is otherwise contrary to law." R.C.

42.

2953.08(G)(2)(a) and (b).  The state is permitted to appeal a sentence as a matter of right if the sentence is contrary to law. R.C. 2953.08(B)(2). A sentence that does not comply with a mandatory provision of the sentencing statutes is contrary to law. *State v. Williams*, 2022-Ohio-2439, ¶ 50 (6th Dist.).

{¶ 106} Appellant was found guilty of burglary in violation of R.C. 2911.12(A)(2) and (D).  That offense was committed after March 22, 2019.  R.C. 2929.14(A)(2)(a) states:

> [I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender pursuant to this chapter, the court shall impose a prison term that shall be one of the following:
> * * *
> (2)(a) For a felony of the second degree committed on or after March 22, 2019, the prison term *shall* be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code, except that if the section that criminalizes the conduct constituting the felony specifies a different minimum term or penalty for the offense, the specific language of that section shall control in determining the minimum term or otherwise sentencing the offender but the minimum term or sentence imposed under that specific language shall be considered for purposes of the Revised Code as if it had been imposed under this division.

(emphasis added).  Under the plain language of the statute, the trial court was required to impose an indefinite prison term on appellant's burglary offense.  It failed to do so, rendering the sentence contrary to law.  *See State v. Chambers,* 2024-Ohio-3341, ¶ 211-214 (6th Dist.).  For this reason, we find the state's single cross-assignment of error well-taken.

43.

## IV. Conclusion

{¶ 107} For the foregoing reasons, we find appellant's first, second, third, and fourth assignments of error not well-taken.  We affirm the trial court's September 5, 2023 judgment as it relates to appellant being found guilty of rape, burglary, and gross sexual imposition.  However, we find the state's cross-assignment of error alleging that the trial court erred when it failed to impose an indefinite sentence on appellant's burglary offense pursuant to R.C. 2929.14(A)(2)(a) well-taken.  As a result, we remand the matter to the trial court for resentencing.

{¶ 108} Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
reversed, in part and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.            _____
                                                    JUDGE

Gene A. Zmuda, J.            

Myron C. Duhart, J.            _____
CONCUR.                                         JUDGE

_____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.